## TRANSPORTES MARITIMOS DE ESTADOS v. ROTCH.

(District Court, D. Massachusetts. April 28, 1923.)

No. 2002.

I. Pilots ⚙⟹16—Stranding of steamship held due to negligence of pilot.

Stranding of a foreign steamship, entering New Bedford harbor for the first time, *held* due to negligence of the pilot in charge, who, though uncertain as to the channel, kept on at full speed until in the shoals, when he could have determined his proper course from shore ranges.

2. Pilots ⚙⟹15—Bound to exercise ordinary skill and care.

Pilots are bound to exercise ordinary skill and care according to the rules of navigation.

In Admiralty. Suit by the Transportes Maritimos de Estados, owner of the steamship Sao Vicente, against Russell W. Rotch. Decree for libelant.

Charles N. Serpa, of New Bedford, Mass., for libelant.

William A. Morse and Blodgett, Jones, Burnham & Bingham, all of Boston, Mass., for respondent.

PETERS, District Judge. This is a libel in personam, brought by a division of the Portuguese government, owner of the steamship Sao Vicente, against a licensed pilot, on account of the grounding of the steamer coming into New Bedford harbor while in charge of the pilot.

I find the following facts :

The Sao Vicente, of 5,085 gross and 3,246 net tons register, under the command of an experienced Portuguese navigator, whose English was confined largely to navigating terms, and who had never before been in these waters, left Lisbon, bound for New Bedford, with some 400 passengers arrived in Vineyard Sound and picked up a pilot (the respondent) on February 15, 1921, at about 10:30 a. m.

The pilot, then about 58 years old, for 40 years familiar with the waters near and the approaches to New Bedford, and having had a license as pilot for 18 years, undertook to carry the ship into New Bedford, and took charge of her for that purpose.

Proceeding with the voyage, he carried the vessel between Phinney Rock and Hursell Rock, the proper course, and continued on to nearly the straight line which on the chart marks the prolongation of the center line of the channel coming out from New Bedford inner harbor. Then he changed his course to about northeast by north for the purpose of passing between Brooklyn Rock and Henrietta Rock, well-known points on each side of the channel and marked by red and black spar buoys.

The most westerly of the two rocks on each side of the ship channel at this point is Brooklyn Rock, and about 900 yards a little south of westerly from it is the black buoy marking the lower end of North Ledge.

When the pilot changed the course of the vessel to run up the channel, he was, according to the mark he made on the chart, a trifle over

a mile distant in a southeasterly direction from Brooklyn Rock, that being, as will be seen, the middle rock of the three, with North Ledge on the west and Henrietta Rock on its east; the channel going between Brooklyn Rock and Henrietta Rock.

The buoy on North Ledge was a black spar buoy, which always replaced in winter a black can buoy used there in summer.

At this time, about 11:30 in the forenoon, the weather was clear, the sun shining, sea moderate, wind light from the southwest and thermometer about 30. This also was substantially the report of the weather station 10 miles distant. The pilot says the sun was shining, but that the atmosphere was not clear; that the air was "loamy," "making things appear unnatural," which condition occurs, he says, sometimes with a northerly wind.

At this point, with the three spar buoys in a line three-fourths of a mile long on his port bow, the channel being between the two easterly or right-hand buoys, the pilot began to look for the buoy on North Ledge, which was on his extreme left. He says that he was looking for a can buoy, not knowing that it had been changed. After looking, as he says, from three to five minutes, and not finding it, the following is his description of the occurrence, on examination by his counsel:

"Q. Now, we have come to the point, Captain, of where you were looking for the buoy on North Ledge and did not see it, and had seen these two buoys on Henrietta and Brooklyn Ledges. Now will you tell your story from there, Captain, in just your own way? A. Well, after deciding that this buoy had been changed, by not picking it up, I then began to look around where the vessel was—the position she had got into while my attention had been drawn towards picking up this buoy.

"The Court: You had then seen Henrietta and Brooklyn buoys?

"The Witness: Yes, sir.

"The Court: Recognized them?

"The Witness: Yes, sir; and then I had found out my mistake.

"The Court: What was the mistake?

"The Witness: I had called the Brooklyn Rock the buoy on the south end of North Ledge. We was to the southward of them; they was on our port hand, going parallel with them, and as we went along I was still looking for the buoy on North Ledge; that is the way I called them, but I began to look around and see the position of the ship. I see that was not the case, and the ship then had got down to a point about—a little—about three-eighths of a mile from Black Rock, or thereabouts, and about half a mile from Packet Rock, away. That was the position I found myself in when I gave this order to starboard the helm and bring the ship to port. * * *

"The Witness: And for the reason that the order was not promptly obeyed, and the ship did not start on that—come to port immediately, and when she did get coming to port my chance was lost, by the order being not promptly executed.

"Q. And what happened? A. And the consequence was that the ship got too near the bottom; that she did not mind her helm, and kept right on a straight course, nearly, and then she grounded."

The point on the chart marked by the pilot as the location of the ship when he ordered her brought to port was a little more than a third of a mile easterly of Henrietta Rock, with the ship heading for the shoals around Black Rock, about a third of a mile away, and running the same speed as up the bay, being 8 or 10 knots an hour. Obviously this was a dangerous situation. The ship was heading

into a pocket of shoals with scant sea room. Without slackening speed the pilot tried to swing to port and avoid the shoals south of Packet Rock. The attempt failed and the ship grounded between the two buoys marking Packet Rock.

[1] The pilot lays this disastrous ending of his trip to the fault of the men running the ship, alleging that, if his order to swing to port had been more promptly executed, there would have been no trouble.

There are several reasons why this will not exculpate the pilot. No doubt to his apprehensive imagination the vessel turned slowly. In a very short time she was in the shoal water and failed to mind her helm. The pilot is the only one who says his order was not promptly obeyed on the bridge, and in his statement to the port captains the next day, explaining the matter, he failed to mention this point. But in any event he should not have had the ship where she was, heading as she did, with no lessening of speed. He was responsible for the situation, even if a less sluggishly operated ship might have escaped. This one did not.

It is plain that the real cause of the disaster was missing the channel, due to mistaking the red and black buoy on Brooklyn Rock for the black buoy on North Ledge.

The pilot explains this apparent lack of ordinary skill and care by saying that the buoys were so iced up that it was difficult to identify them, that the air was "loamy," that he did not know the summer can buoy on North Ledge had been replaced by a spar buoy, and that the lookout on the ship did not report any buoys.

Other witnesses denied the ice on the buoys. If the pilot thought they were obscured by ice, or that the visibility was deceptive, he should have used more care and slowed up until he made out his position. It was part of his business to know whether the can buoy had been replaced as usual, or at least to remember and reason that it might have been replaced, as it was now the middle of February.

The lookout could not have given the pilot any information about the two buoys in front of him, as he saw them himself, and, if he desired help in picking up what he thought should be a can buoy further to the left, he should have said so.

Unfortunately the very conditions claimed by the pilot to exist, if they did exist, only emphasize his negligence, because he testifies that from the moment when he left Wilkes Ledge, down the bay, until the ship grounded, there was no time when he could not have told his course with precision by his ranges and marks on the shore. Failing to use these, when he thought his other data were unreliable, is inexcusable.

[2] Pilots are bound to exercise ordinary skill and care according to the rules of navigation. The Tom Lysle (D. C.) 48 Fed. 690.

I am forced to the conclusion that the pilot in this case did not use such care and skill as the law requires.

A decree will have to be entered for the libelant. An assessor to determine the damages.